Filed 3/8/16  P. v. Hernandez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>ARMONDO HERNANDEZ et al.,<br><br>      Defendants and Appellants. | C068079<br><br>(Super. Ct. Nos.<br>SF113661C & SF113661A) |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>MARTIN FLORES,<br><br>      Defendant and Appellant. | C068517<br><br>(Super. Ct. No. SF113661B)<br><br>OPINION ON<br>TRANSFER |

Defendants Armondo Hernandez, Roberto Arias, and Martin Flores participated in several crimes in Tracy, including the murder of Spencer Sampson and multiple assaults on others, in December 2009. The crimes were committed for the benefit of defendants' criminal street gang. Sentenced to determinate and indeterminate terms in state prison, defendants appeal.

On appeal, defendants, each represented separately, make numerous contentions of error in the trial court proceedings. Some contentions are unique to one defendant, but others are common to two or all three of the defendants. We indicate in the heading of each contention who is making the contention.

We conclude that only one contention has merit. The trial court sentenced defendants Arias and Flores to determinate and indeterminate terms without indicating in its oral pronouncement of sentencing whether the indeterminate terms would be concurrent or consecutive. As a result, the indeterminate terms were concurrent by operation of law. The minute orders and abstracts of judgment, however, stated that the indeterminate terms were consecutive. We therefore affirm the judgments and direct the trial court to correct the clerical errors in the minute orders and abstracts of judgment.

## FACTS

Defendants' crimes occurred on two days, December 16 and 18, 2009.[1] Four perpetrators were prosecuted, including the three defendants here. The fourth, Jose Hernandez, was a minor at the time of the crimes, and he was tried separately.[2] Not every defendant participated in every crime, but all participated in some.

---

[1] All dates in this opinion refer to 2009.

[2] Jose Hernandez was convicted of attempted murder and other crimes and sentenced to a total term of 61 years to life. He has appealed the judgment. (C067260.) In this opinion we refer to Jose Hernandez by his full name and to Armondo Hernandez, who is one of the three defendants prosecuted together, as defendant Hernandez.

Defendants are members of the Proud Brown Trece subset of the Sureños criminal street gang, which is a rival of the Norteños criminal street gang. We do not relate here the specific facts supporting their designation as gang members, but we fully discuss those facts later in relation to their contentions concerning gang allegations and findings.

Two juries heard the evidence in this proceeding – one jury as to defendant Flores and the other as to defendants Arias and Hernandez. Defendant Flores had a separate jury mainly because he gave a statement to police concerning the crimes and implicating his codefendants. While we refer to the statement of defendant Flores in this factual summary, that evidence was not presented against defendants Arias and Hernandez and is not being considered with respect to the contentions of defendants Arias and Hernandez.

A. *Assault on John Doe (count 12 as to defendant Flores only)*

The gang's crime spree began on December 16, when defendant Flores and several associates saw a Norteño gang member, and some of defendant Flores's group chased him. Someone in the group shot at the Norteño three to five times.

In his statement, defendant Flores said that he joined defendant Arias, Jose Hernandez, and others whom he did not know or identify, in the search for a particular Norteño. They did not find that specific Norteño, but they found another. Although defendant Flores claimed he stayed in the truck, others got out and confronted the Norteño. They asked if he was a Norteño, and he confirmed it. They then chased the Norteño, and Jose Hernandez fired the shots, which probably did not hit the man.

B. *Assaults on Edward Rigor and Melanie Bartolomei (counts 1, 3 & 4 as to defendants Flores and Arias only)*

Also on the evening of December 16, defendants Flores and Arias, along with one other person, followed Edward Rigor and Melanie Bartolomei into an apartment complex. Either defendant Flores or defendant Arias challenged Rigor, who used to be a Norteño, to say, "[F]uck [N]orte," which he refused to do. As Rigor and Bartolomei walked away, one of the defendants fired four or five rounds in the direction of Rigor and

3

Bartolomei. Two bullets struck Rigor, and one pierced his right lung. A bullet also went through an apartment window. Bartolomei identified defendant Arias as the gunman, but Rigor identified defendant Flores as the gunman.

In defendant Flores's statement to police, he claimed that he drove the group to the apartment complex but that he stayed in the truck and kept the engine running while the others went into the apartment complex to confront the man they suspected of being a Norteño. Defendant Flores heard one gunshot, and he drove away after the others got back in the truck.

C.     *Assault on James Stancampiano (counts 5 & 6 as to defendant Flores only)*

Again on the evening of December 16, five or six shots were fired in the vicinity of a shopping center with a Supercuts hair salon. Norteño gang member James Stancampiano, panicked and shaky, ran into the Supercuts. He asked to use a telephone, and he called someone and pleaded for a ride from the person he called. He told the salon manager that someone was shooting at him. Three men appeared outside of Supercuts. Defendant Flores opened the door and told the people inside that they needed to get Stancampiano out of there because the police were after him. The salon manager told Stancampiano to leave. Stancampiano peeked out the door, and then ran away.

In his statement to police, defendant Flores said that they saw a Norteño, so some of the others in the group got out of the truck and chased the Norteño while defendant Flores stayed in the truck. Someone shot at Stancampiano three or four times until he escaped into the shopping center. Defendant Flores parked the truck and helped search for Stancampiano. They found him at Supercuts, but defendant Flores claimed it was defendant Arias who opened the door and told the people inside to make Stancampiano leave.

On December 18, defendant Flores had a text messaging conversation with someone in which he texted that (1) they were "going to shoot chapetas," (2) on December 16 they had "shot three," and (3) they had "hit the target."

D.   *Assaults on David Zepeda and Angelo DeHaro (counts 7 & 8 as to all defendants)*

Between 9:00 and 9:30 p.m. on December 18, defendant Flores was stopped in his GMC Yukon by a Tracy police officer near the Bonfare Market. The officer impounded the Yukon because defendant Flores did not have a driver's license.

After his vehicle was impounded, defendant Flores communicated by text and phone calls with defendant Arias and went into the Bonfare Market. Security camera footage from the market showed that defendant Flores walked into the market as three people – Spencer Sampson and Robert Limon (both Norteños) and Stephanie Sampson – were leaving. Spencer Sampson and defendant Flores exchanged words, but Spencer Sampson and his group left the store.

In his statement to police, defendant Flores said that he, defendant Arias, defendant Hernandez, and others met up and went looking for the Norteños who had insulted him at the market.

Around 10:00 p.m. on December 18, Angelo DeHaro was walking along a street with David Zepeda when they heard a whistle and saw three or four people running toward them. The approaching men were wearing bandanas over their faces, and one of them was holding a silver object in his hand. DeHaro and Zepeda began running and split up.

DeHaro was hit in the back of the head with a rock. He fell to the ground face first, but he was able to get back up and flee. Another rock went over his shoulder. His head injury required five staples. DeHaro identified defendant Arias as the assailant who was holding the silver object in his hand.

Zepeda slipped on a wet lawn and fell. Before he could get back up, four men attacked him. They kicked and punched him in the upper body, stomach, and head, and they told him to say, "[F]uck [N]orte." Zepeda rolled into a ball and covered his head with his hands and arms to try to protect himself. One of the men pointed the silver

5

object, which was a gun, at Zepeda's face while the others beat him. Zepeda sustained lumps, bruises, and scratches from the attack. He identified defendant Hernandez as one of the assailants.

In his statement to police, defendant Flores said that he and his group attacked DeHaro and Zepeda.

E. *Murder of Spencer Sampson (count 9 as to all defendants) and assaults on Stephanie Sampson (count 10 as to defendant Flores only) and Robert Limon (count 11 as to all defendants)*

After the attack on DeHaro and Zepeda, defendants' group found the Sampsons and Limon, who were on foot. The group got out of their car and approached the three, wanting to fight. They circled around Stephanie Sampson, demanding that she say, "[F]uck [N]orte." Spencer Sampson intervened, and someone in defendants' group lifted up his shirt, showing a gun. Then someone struck Stephanie Sampson in the ear, which touched off fighting.

Two men from defendants' group fought with Limon and knocked him to the ground. Another fought with Spencer Sampson. After a brief period of fighting, someone in defendants' group shot Spencer Sampson. Defendants' group then fled in their car. Spencer Sampson died of a gunshot wound to the chest.

Stephanie Sampson identified defendant Arias as the one who had the gun and fought with Spencer Sampson, and she identified defendants Flores and Hernandez as the two who initially fought with Limon.

In his statement to police, defendant Flores described how his group drove around until they found the Sampsons and Limon. He claimed that he did not know how Spencer Sampson was shot and that he did not know someone had a gun, although he acknowledged that they always carried a gun. He also claimed that defendant Hernandez had the gun during the attack. Defendant Flores said that he just wanted to scare the Norteños and did not know anyone would get shot.

6

As with defendant Flores's statement to police, his text messages soon after the murder of Spencer Sampson were presented to his jury only. He texted a friend, "First we fucked two that weren't [Norteños], and then we found the three and we shot one."

PROCEDURE

The information covered four defendants (including Jose Hernandez, who was not tried with defendants and is not a party to this appeal) and several incidents. We need not recount the details of the information; instead, we summarize the verdicts and sentencing as to each of the three defendants involved in this appeal.

*Jury Verdicts*

**As to defendant Hernandez**:

Count 7:    guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on David Zepeda (Pen. Code, § 245, former subd. (a)(1)).[3]

    True finding:    committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 8:    guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on Angelo DeHaro (§ 245, former subd. (a)(1)).

    True finding:    committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

---

[3]    Hereafter, citations to an unspecified code are to the Penal Code.

7

Count 9:     guilty of murder of Spencer Sampson (§ 187, subd. (a)).

 True findings:  murder in the *second* degree (§ 189);

      a principal intentionally and personally discharged a firearm causing death (§ 12022.53, subd. (d) & (e)); committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 11:     guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on Robert Limon (§ 245, former subd. (a)(1)).

 True finding:  committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

**As to defendant Arias**:

Count 7:     guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on David Zepeda (§ 245, former subd. (a)(1)).

 True finding:  committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 8:     guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on Angelo DeHaro (§ 245, former subd. (a)(1)).

 True finding:  committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 9: guilty of murder of Spencer Sampson (§ 187, subd. (a)).

True findings: murder in the *first* degree (§ 189);

a principal intentionally and personally discharged a firearm causing death (§ 12022.53, subd. (d) & (e));

committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1));

*special circumstance* that murder committed for the benefit of a criminal street gang (§ 190.2, subd. (a)(22)).

Count 11: guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on Robert Limon (§ 245, former subd. (a)(1)).

True finding: committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Also as to defendant Arias, the jury was unable to reach verdicts on counts 1 (attempted murder of Edward Rigor), 3 (assault with a firearm on Melanie Bartolomei), and 4 (shooting at an occupied dwelling). The court declared a mistrial on those counts and dismissed them.

**As to defendant Flores**:

Count 1: guilty of attempted murder of Edward Rigor (§§ 187, subd. (a); 664).

True findings: attempted murder was willful, deliberate, and premeditated (§ 664, subd. (a));

a principal intentionally and personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e));

9

committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 3:    guilty of assault with a firearm on Melanie Bartolomei (§ 245, subd. (a)(2)).

    True finding:    committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

    *Not* true finding:    a principal was armed with a firearm during the commission of the crime (§ 12022, subd. (d)).

Count 4:    guilty of shooting at an occupied dwelling (§ 246).

    True findings:    a principal intentionally and personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e));

        committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 5:    guilty of attempted murder of James Stancampiano (§§ 187, subd. (a); 664).

    True findings:    attempted murder was willful, deliberate, and premeditated (§ 664, subd. (a));

        committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

    *Not* true finding:    defendant personally used a firearm (§ 12022.5, subd. (a)).

Count 6:    guilty of assault with a firearm on James Stancampiano (§ 245, subd. (a)(2)).

    True finding:    committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

*Not* true finding:  defendant personally used a firearm (§ 12022.5, subd. (a)).

Count 7:  guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on David Zepeda (§ 245, former subd. (a)(1)).

True finding:  committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 8:  guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on Angelo DeHaro (§ 245, former subd. (a)(1)).

True finding:  committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 9:  guilty of murder of Spencer Sampson (§ 187, subd. (a)).

True findings:  murder in the *first* degree (§ 189);

committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1));

*special circumstance* that murder committed for the benefit of a criminal street gang (§ 190.2, subd. (a)(22)).

*Not* true finding:  a principal intentionally and personally discharged a firearm causing death (§ 12022.53, subds. (d) & (e)).

Count 10:  guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on Stephanie Sampson (§ 245, former subd. (a)(1)).

True finding:  committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

11

Count 11: guilty of assault with a deadly weapon or by means of force likely to cause great bodily injury on Robert Limon (§ 245, former subd. (a)(1)).

    True finding: committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

Count 12: guilty of assault with a firearm on John Doe (§ 245, subd. (a)(2)).

    True finding: committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

*Sentencing*

**As to defendant Hernandez:**

The trial court imposed (1) a total determinate term of 14 years four months for counts 7, 8, and 11 and (2) a consecutive indeterminate term of 40 years to life for count 9.

**As to defendant Arias:**

The trial court imposed (1) a total determinate term of 14 years four months for counts 7, 8, and 11 and (2) an indeterminate term of life without possibility of parole for count 9.

**As to defendant Flores**:

The trial court imposed (1) a total determinate term of 22 years four months for counts 3, 6 (stayed), 7, 8, 10, 11, and 12; (2) an indeterminate term of 25 years to life for count 4 (stayed); (3) an indeterminate term of life with minimum parole eligibility at 15 years for count 5; (4) an indeterminate term of life, plus 25 years to life for count 1; and (5) an indeterminate term of life without possibility of parole for count 9.

DISCUSSION

I

*Denial of* Miranda *Motion*[4]

Flores

Defendant Flores contends the trial court erred by denying his motion to exclude his statements made at the police station and later at the jail as violations of his rights under *Miranda, supra,* 384 U.S. 436. The contention is without merit.

A. *Law*

*Miranda* applies only to custodial interrogations. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) In reviewing the trial court's determination that defendant was not in custody, we apply a deferential substantial evidence standard of review to the trial court's conclusions regarding the historical facts. (*Id*. at p. 402.) We independently review the mixed question of law and fact regarding whether a reasonable person would have felt free to terminate the interrogation. (*Ibid*.)

The prosecution bears the burden of demonstrating the validity of a defendant's waiver of his *Miranda* rights by a preponderance of the evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 751.) Additionally, " '[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation.' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*).)

B. *Facts and Ruling*

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

13

Midtrial, the trial court held a hearing to determine whether defendant Flores's *Miranda* rights were violated, requiring exclusion of his statement to police. We recount the evidence from that hearing in its light most favorable to the trial court's ruling. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1050.)

At 5:30 a.m. on December 19, 2009, the morning after the Spencer Sampson murder and within three days after all of the offenses, several detectives, including Detectives Matthew Sierra and Carlos Ramirez, went to defendant Flores's home. Detective Ramirez had seen the video of the confrontation at Bonfare Market, and he went to defendant Flores's home to investigate whether defendant Flores was involved in the shooting.

Defendant Flores's aunt answered the door and invited the detectives into the house. The detectives found defendant Flores in his bedroom and, in Spanish, told him to wake up and get up. Detective Ramirez told defendant Flores that he was investigating a shooting and asked whether defendant Flores was willing to go to the police department to provide a statement. He was not placed under arrest. Detective Ramirez transported defendant Flores to the police department in the backseat of an unmarked police vehicle that had a cage. Defendant Flores was not handcuffed.

When Detective Ramirez was asked at the hearing on the *Miranda* motion how he knew defendant Flores understood the detective's Spanish, Detective Ramirez responded: "He was compliant with my commands."

Defendant Flores was taken to an interview room where Detective Ramirez closed the door and told defendant Flores he was free to leave and began asking him questions. No *Miranda* advisement was given at the beginning of the interview. Detective Ramirez questioned defendant Flores about where he had been the day before. Defendant Flores said that he had gone to a friend's house and did not go to a store. After further questioning, defendant Flores changed his story and admitted he had gone to Bonfare Market, but he denied that he had a confrontation at the store. When Detective Ramirez

14

said he had a video of what happened at the store, defendant Flores admitted that he had words with a person there who had asked if he was a Sureño or a scrapa (an offensive name for a Sureño). Defendant Flores said that, after he left the store, his friend German took him to German's house and then home.

Detective Ramirez told defendant Flores he did not think defendant Flores was telling the truth because his story did not match what others had said about when he got home. He told defendant Flores that what would help him would be to tell the truth.

Defendant Flores stated that he was present at the shooting of Spencer Sampson, but that he did not fire the gun and intended to fight with his fists only. At this point, Detective Ramirez advised defendant Flores of his *Miranda* rights. Defendant Flores said that he understood the rights. When, in reading the rights from a card, Detective Ramirez asked whether defendant Flores was willing to talk without a lawyer present, defendant Flores said: "No, well right now I just want [to] be like this for a while." Detective Ramirez asked him if he wanted to be alone, and defendant Flores said yes. Detective Ramirez offered to get him some water, and defendant Flores accepted the offer. So Detective Ramirez left the room.

Detective Ramirez returned to the interview room after about a minute with a cup of water and left the room. About two minutes later, he returned with a *Miranda* form. He had defendant Flores sign the form indicating that he understood his rights. He then asked defendant Flores to explain again what happened at Bonfare Market and later, which defendant Flores did. At the end of the interview, Detective Ramirez placed defendant Flores under arrest.

Two days later, Detective Ramirez interviewed defendant Flores again at the jail. He advised defendant Flores of his rights, and defendant Flores answered Detective Ramirez's questions.

The trial court excluded any statements made by defendant between the time Detective Ramirez accused defendant Flores of lying and when the detective gave

15

defendant Flores the *Miranda* form.  As to the statements made before the accusation of lying, the court found that defendant Flores was not in custody and that he went with Detective Ramirez to the police station voluntarily.  He was free to leave.

The court concluded that defendant Flores did not invoke his right to remain silent or to have an attorney.  The court discussed defendant Flores's response to the advisement when he said, "No, well right now I just want [to] be like this for a while."  The court said:  "[W]e are required to look at the entire context here of the statement.  In other words, don't take that 'no' out of context.  If we just looked at the 'no,' that would be the end of it, but we have to look and see what he says."  The court continued:  "I don't think he's saying no, I don't want to talk to you.  I think he's saying, no, I want to think about it a little while."  The court concluded that defendant Flores was asking for a delay, not to remain silent or to have an attorney.

Finally, the court found that the statements were voluntary, knowing, and intelligent.  There was no duress, promises, or threats.

C.     *Analysis*

Defendant Flores makes three assertions of error concerning the motion to exclude his statements:  (1) he was in custody and subject to interrogation from the beginning of the interview with Detective Ramirez; (2) he did not waive his right to remain silent or to have an attorney present; and (3) statements made after the advisement were tainted by the violation of his rights before the advisement.  We conclude:  (1) he was not in custody before he received the *Miranda* advisement; (2) he waived his rights to remain silent and to have an attorney present; and (3) his statements after the advisement were not tainted.

1.      Custodial Interrogation

Detective Ramirez's initial interview with defendant Flores before the *Miranda* advisement was given did not constitute custodial interrogation under *Miranda* because defendant Flores was not in custody.  Since defendant Flores was not in custody before

16

the *Miranda* advisement was given, we need not determine whether the interview constituted interrogation.

"Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole. [Citation.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404, fn. omitted.)

Considering these factors, defendant Flores was not in custody during the interview. He was not formally arrested until after the interview and was not handcuffed. The interview was not long. Although there were several detectives present at defendant Flores's home, only Detective Ramirez questioned defendant Flores at the police station. The questioning was not accusatory, at least until Detective Ramirez said he thought defendant Flores was lying, and the court excluded statements made after that point until the *Miranda* advisement was given. Even when Detective Ramirez said he thought defendant Flores was lying, the detective was not aggressive or confrontational. Defendant Flores agreed to accompany Detective Ramirez to the police station to be interviewed, and he was informed that he was free to leave. And, while defendant Flores

17

was arrested at the conclusion of the interview, it was because he gave information the police did not have beforehand that he was present at the shooting.

Defendant Flores marshals other facts to support his argument that he was in custody from the beginning of the interview. The police arrived at his home at 5:30 in the morning and rousted him out of bed. Detective Ramirez acknowledged that defendant Flores understood Spanish because he was "compliant with [his] commands." Detective Ramirez took him to the police station (a police dominated environment) rather than questioning him at his home, and he was placed in the backseat of a caged police car. The interview room was small and windowless, and the door was closed.

None of the circumstances cited by defendant Flores precludes a finding that he was not in custody at the beginning of the interview. Contrary to defendant Flores's argument, the totality of circumstances did not establish that he was in custody before Detective Ramirez gave the *Miranda* advisement because a reasonable person would not interpret the restraints used by the police as tantamount to a formal arrest. (*People v. Pilster, supra,* 138 Cal.App.4th at p. 1403.) Defendant Flores agreed to go to the police station to answer questions, and Detective Ramirez made it clear that defendant Flores was free to leave. Since he was not in custody at the beginning of the interview, the trial court properly denied defendant Flores's motion to exclude his statements.

Defendant Flores cites *People v. Aguilera* (1996) 51 Cal.App.4th 1151 (*Aguilera*) as support for his position that he was in custody from the beginning of the interview. To the contrary, that case is factually distinguishable.

In *Aguilera*, the police went to the defendant's house and asked him and his mother if the defendant would talk to them at the station about a killing. (*Aguilera, supra,* 51 Cal.App.4th at p. 1159.) That circumstance is similar to defendant Flores's case, but the circumstances at the station in *Aguilera* were very different. The police conducted an interrogation that was "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating." (*Id*. at p. 1165.) The appellate

18

court concluded that the officers conveyed to the defendant the message that he would be interrogated until he admitted his involvement in the crime. (*Id*. at p. 1163.) That did not happen here. Nothing Detective Ramirez said or did up until he gave the *Miranda* advisement gave the impression that defendant Flores was not free to leave.

Defendant Flores was not in custody before Detective Ramirez gave the *Miranda* advisement.

### 2.    Waiver of *Miranda* Rights

The court's determination that, under the totality of the circumstances, defendant Flores made a knowing and intelligent waiver of his *Miranda* rights of the advisement was given is supported by substantial evidence. Defendant Flores claims that he invoked his right to remain silent and his right to have an attorney present when he responded to Detective Ramirez's question about being willing to talk without a lawyer present by saying, "No, well right now I just want [to] be like this for a while." The trial court concluded that, under the totality of the circumstances, this was not an invocation of his right to remain silent and to have a lawyer present. We agree.

"[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. [Citation.] [The Supreme Court has] recognized that a valid waiver of *Miranda* rights may be express or implied. [Citations.] A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.] In contrast, an unambiguous request for counsel or a refusal to talk bars further questioning. [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 667-668.) "[T]he standard for assessing an ambiguous invocation of the right to counsel is an objective one that asks what a reasonable officer would have understood the nature of the suspect's request to be

under all the circumstances." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217-218.)

If defendant Flores had said "no" without more, it would have signaled invocation of his rights. However, he immediately qualified it by adding, "well," which indicated ambivalence. He then added: "[R]ight now I just want [to] be like this for a while." The trial court, as apparently did Detective Ramirez, interpreted this as being a request for a temporary delay in the questioning, not an invocation of his rights. We agree. Defendant Flores had been cooperative up to that point and remained cooperative. His actions after the *Miranda* advisement were consistent with merely wanting a delay rather than desiring to invoke his rights to remain silent and to have a lawyer present.

Defendant Flores faults Detective Ramirez for not clarifying defendant Flores's intention because the statement could be seen as ambiguous. If a defendant's response to a request for waiver of rights is ambiguous, an officer *may* request clarification. (*Williams, supra,* 49 Cal.4th at p. 428.) Citing *Williams*, defendant Flores claims that Detective Ramirez had a *duty* to seek clarification. That is not the law. (*People v. Martinez* (2010) 47 Cal.4th 911, 951-952.) If no clarification of an ambiguous statement was sought, we simply apply the objective standard to determine "what a reasonable officer would have understood the nature of the suspect's request to be under all the circumstances." (*People v. Sauceda-Contreras, supra,* 55 Cal.4th at pp. 217-218.). Here, it was reasonable for Detective Ramirez to conclude that defendant Flores's wanted a temporary delay, not that he wanted to invoke his rights to remain silent and to have a lawyer present.

Defendant Flores cites *People v. Peracchi* (2001) 86 Cal.App.4th 353 (*Peracchi*), a case in which the defendant made a similar statement when asked whether he would waive his right to remain silent. We conclude the case is distinguishable.

In *Peracchi*, after the officer read the defendant his *Miranda* rights and asked the defendant whether he wanted to talk, the defendant responded, " ' "At this point, I don't

20

think so.  At this point, I don't think I can talk." ' "  When the officer tried to clarify, the defendant explained that his head was " ' "not clear enough" ' " to discuss the charges against him " ' "right now." ' "  When the officer again tried to clarify, the defendant said, " ' "I don't want to discuss it right now." ' "  (*Peracchi, supra,* 86 Cal.App.4th at pp. 358-359.)  The trial court admitted the defendant's statement, but the appellate court concluded that once the defendant said, " 'I don't want to discuss it right now,' " he was "clearly indicating that he intended to invoke his right to remain silent."  (*Id.* at p. 361.)

The defendant in *Peracchi* clearly stated that he did not want to talk to the officer.  In this case, however, even though defendant Flores started his answer with "no," he immediately qualified it by saying "well," which indicated to a reasonable officer that "no" was not his final answer.  In *Peracchi*, on the other hand, the defendant made it known that he did not want to talk at that point.  Unlike defendant Flores, the defendant in *Peracchi* did not immediately step back from his original negative response.  Accordingly, *Peracchi* does not support defendant Flores's contention that he invoked his rights to remain silent and to have a lawyer present.

Defendant Flores waived his rights to remain silent and to have a lawyer present.

### 3.  *Taint on Post-advisement Statements*

Defendant Flores's statements made after the *Miranda* advisement were not tainted because Detective Ramirez did not elicit pre-advisement statements in violation of *Miranda.*

In *Missouri v. Seibert* (2004) 542 U.S. 600 [159 L.Ed.2d 643] (*Seibert*), the United States Supreme Court held that a confession obtained in violation of *Miranda* is inadmissible even if the defendant later received a *Miranda* advisement, waived his right to remain silent, and repeated the confession.

We first observe that defendant Flores did not raise the *Seibert* issue in the trial court.  He did not argue that his post-*Miranda*-advisement statements were tainted by earlier pre-*Miranda*-advisement statements.  An appellant may not raise on appeal an

21

argument for exclusion of evidence that was not presented at trial. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1233, fn. 6.)

In any event, *Seibert* is inapplicable here because defendant Flores's pre-advisement statements were not obtained in violation of *Miranda*.

## II

### *Removal of Juror*

### All Defendants

A juror on the Arias/Hernandez jury was removed during trial, and over the objection of counsel for both Arias and Hernandez, because the juror was sick.[5] On appeal, defendants Arias and Hernandez contend that removal of the juror was error and, as a result, violated their constitutional jury trial rights because it was not shown by demonstrable reality that the juror was unable to perform the functions of a juror. The contention is without merit because the evidence was that the juror was sick and the court actually relied on that evidence in removing the juror.

Section 1089 guides the trial court in the event a juror is unable to continue to perform the duties of a juror. It provides in part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors." (§ 1089.)

---

[5] Defendant Flores declared that he joins in "all the arguments made by both Arias and Hernandez." (Cal. Rules of Court, rule 8.200(a)(5).) Since this jury issue did not affect the jury that tried defendant Flores, we see no application of the issue to defendant Flores.

Removal of a juror under section 1089 is committed to the discretion of the trial court, and we review whether the grounds for such removal appear in the record as a "demonstrable reality." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.) "The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [the basis for removal] was established." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053, original italics.) The Legislature has left to the discretion of the trial court the procedure for determining good cause to remove a juror. (*People v. Duff* (2014) 58 Cal.4th 527, 560, fn. 15.)

Late in the trial, before closing arguments, the court informed defendants Arias and Hernandez that Juror No. 12 called the clerk that morning. The juror told the clerk that "she is sick. She is unable to finish the trial. She needs to be removed because of illness. She's going to the doctor today." Counsel for Arias said he did not want Juror No. 12 removed because there were two alternates that he did not want on the jury. Counsel for Hernandez argued that more evidence than just the juror's statement to the clerk was needed to justify removing the juror. He wondered if she just did not want to decide the case or that her illness was temporary and she could continue after getting better. The trial court ruled: "She says she's sick and is unable to continue in the jury. . . . [W]e just have to go with what the juror says. That's why we have alternates. We have three alternates. We'll choose one at random, but based on the statement of the juror to my clerk, she called this morning and said she'd be unable to continue[.] I will excuse her over objection."

The evidence here, as established by the juror's statements to the clerk, was that Juror No. 12 was ill and was unable to continue, and the trial court actually relied on that evidence in determining that she was unable to proceed. Other than counsel's speculation that Juror No. 12 was not sick but really just did not want to decide the case, there is nothing to cast doubt on the valid, statutory reason for the removal.

In *People v. Dell* (1991) 232 Cal.App.3d 248 (*Dell*), the court removed two jurors for health reasons. One juror, who had been ill during the proceedings, called in to the clerk and said he wished to be excused. As to the other, a cousin called and told the clerk that the juror had been in an accident, was in bad shape, was taken to the hospital, and could not come in that day, although she might be able to come in the next day. (*Id.* at pp. 253-254.)

On appeal, the *Dell* court found no abuse of discretion. It said: "When the juror is not present in the courtroom it would appear unreasonable to require the sick or hospitalized juror to come into the courtroom in order to hold a hearing to substantiate the factual basis for the juror's claim of illness. . . . '[A] hearing would have been pointless and perhaps callous.' In this case, it appears from the record all parties knew juror number 3 was sick during the trial. The court's observation of the juror's appearance is a sufficient basis to determine the juror is too ill to continue. [Citation.] The court did not observe juror number 10 after her accident. However, the phone call from her cousin saying the juror was in bad shape and was being taken to the hospital for treatment is evidence the juror was too ill to continue functioning as a juror. In the absence of any contrary showing, we can presume there was a factual basis the juror was in fact injured in a car accident and incapable of continuing. [Citation.] [¶] It was within the court's discretion to determine good cause for dismissal. We cannot say on this record the court's decision exceeded the bounds of reason or was manifestly unjust. [Citation.]" (*Dell, supra,* 232 Cal.App.3d at p. 256; see also *People v. Duff, supra,* 58 Cal.4th at p. 560, fn. 15 [court not required to call sick juror into courtroom to establish illness]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1408-1409 [message left on court's answering machine that juror's father-in-law had died was sufficient to justify removing the juror].)

The removal of Juror No. 12 in this case is most similar to the removal of the juror in *Dell* who had been in an accident. Based on a cousin's statements to the court clerk, in

24

that case, the appellate court found there was sufficient evidence to support the trial court's exercise of discretion in removing the juror. Here, the juror, herself, spoke to the court clerk, and there is no evidence that she was not actually sick, going to a doctor, and unable to proceed, as she said. Under these circumstances, the trial court, relying on that evidence, did not abuse its discretion.

Nonetheless, defendants Arias and Hernandez argue that the demonstrable reality test requires more. It does not. Because the trial court actually relied on the evidence of Juror No. 12's illness and illness constitutes good cause under section 1089, the juror's inability to perform the functions of a juror to a demonstrable reality was established. (*People v. Barnwell, supra,* 41 Cal.4th at pp. 1052-1053.)

## III

*Instructions on Aggravated Assault*

All Defendants

Defendants contend that the instructions on aggravated assault (§ 245, former subd. (a)(1) [assault with a deadly weapon or by means of force likely to produce great bodily injury]), combined with the information and the jury verdict forms, improperly (1) allowed the juries to base their aggravated assault verdicts on use of the hands and feet as deadly weapons and (2) included a theory not supported by the evidence because there was no deadly weapon involved. We conclude that there was no error affecting the juries' verdicts. The information improperly stated that the assault with a deadly weapon was with "hands and feet," which are not deadly weapons, but the language in the information was not shared with the juries. The instructions concerning aggravated assault accurately reflected the law. And the jury verdict forms referred to "hands and feet," but that language was placed after the "by means of force likely to cause great bodily injury" language, which did not mislead the jury. We also conclude that, even if there was insufficient evidence to instruct the jury on the deadly weapon theory of aggravated assault, any error was harmless.

25

A.    *Legal Background*

At the time of defendants' crimes, section 245, former subdivision (a)(1) proscribed assault "with a deadly weapon . . . or by any means of force likely to produce great bodily injury . . . ." (Stats. 2004, ch. 494, § 1, p. 4040.)

In *People v. Aguilar* (1997) 16 Cal.4th 1023 (*Aguilar*), the Supreme Court explained that "deadly weapon" in section 245, former subdivision (a)(1) is limited to objects extrinsic to the body and therefore does not include hands and feet.   However, the alternative "force likely" phrase may include the use of hands and feet if they are used in a manner likely to produce great bodily injury.  (*Id*. at p. 1037.)  In other words, an assault by means of force likely to produce great bodily injury may be committed with hands and feet.  (*Ibid*.)

Alleged instructional errors do not merit appellate relief unless there is a reasonable likelihood that the instructions as a whole misled the jury to the defendant's prejudice.  (*Boyde v. California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 329]; *People v. Kelly* (1992) 1 Cal.4th 495, 525-526.)  We must assume that jurors are intelligent people who are capable of understanding, correlating, and following all instructions.  (*People v. Scott* (1988) 200 Cal.App.3d 1090, 1095.)  The question here, then, is whether there was a "reasonable likelihood" that the instructions as a whole led the juries to believe hands and feet were deadly weapons rather than simply being the means of inflicting force.

B.    *Procedure*

Defendants were charged by information with several counts of aggravated assault.  (§ 245, former subd. (a)(1).)  In some of those counts, the information alleged the use of hands and feet.  In count 7, defendants were charged with aggravated assault of David Zepeda, "with a deadly weapon, to wit, HANDS AND FEET, or by means of force likely to produce great bodily injury."  Similar, "hands and feet" language was used to

26

charge defendants of aggravated assault in count 11 (victim Robert Limon). In count 10, defendant Flores, alone, was charged with aggravated assault of Stephanie Sampson, "with a deadly weapon, to wit, HANDS/FEET, or by means of force likely to produce great bodily injury."[6]

The juries were not informed of the charging language used in the information.

Both juries were instructed using CALCRIM No. 875 concerning aggravated assault. The instruction covered both alternative means of violating section 245, former subdivision (a)(1): (1) with a deadly weapon or (2) by means of force likely to produce great bodily injury. It defined a "deadly weapon" as "any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

The prosecutor did not argue to the juries that defendants used a deadly weapon in committing the aggravated assaults charged in the information using the "hands and feet" language. Instead, the prosecutor argued to the juries that the crimes were assault by means of force likely to produce great bodily injury.

The language on the jury verdict forms for these aggravated assault counts differed significantly from the language in the information. On the juries' verdict forms, the court referred to the "crime of Assault with a Deadly Weapon or By Means of Force Likely to Cause Great Bodily Injury upon [the specific victim], to wit, hands and feet . . . ."

C.    *Analysis*

1.    "Hands and Feet" Language

Defendants argue that the trial court erred by allowing the juries to convict defendants of aggravated assault, a violation of section 245, former subdivision (a)(1), by

---

**6**    Count 8 of the information charged a violation of section 245, former subdivision (a)(1) using a rock as the deadly weapon. Defendants do not discuss that count in connection with this issue.

concluding that assault with a deadly weapon was committed with hands and feet. That would be improper under *Aguilar*, but it is not reasonably likely that it happened here. The court did not share with the juries the language in the information referring to hands and feet as deadly weapons. The prosecutor did not argue that aggravated assault was committed using a deadly weapon. And the verdict forms, while using the "hands and feet" language, placed that phrase after the phrase "by means of force likely to produce great bodily injury."

"A longstanding rule of statutory construction -- the 'last antecedent rule' -- provides that 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' [Citations.]" (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680.) We are neither interpreting a statute nor interpreting jury instructions here. Instead, we consider only whether the jury verdict forms misled the jury as to whether hands and feet are deadly weapons. Those instructions referred to the "crime of Assault with a Deadly Weapon or By Means of Force Likely to Cause Great Bodily Injury upon [the specific victim], to wit, hands and feet . . . ." The last antecedent of the "hands and feet" phrase is the force-likely component of aggravated assault. Accordingly, reading the jury verdict forms grammatically and practically, it is unlikely the juries interpreted them to allow the conclusion that hands and feet are deadly weapons, especially in light of the instructions properly defining a deadly weapon and the prosecutor's argument relying on the force-likely component of aggravated assault.

Certainly, hands and feet may be the means of force likely to inflict great bodily injury, which the *Aguilar* court recognized. In that case, the court noted that "the instructions, like the prosecutor's argument, called on the jury to find defendant's conduct had the capability and probability of inflicting great bodily injury under either a 'deadly weapon' theory or a 'force likely' theory. The jury's analytical process was the same in either event." (*Aguilar, supra,* 16 Cal.4th at p. 1037, fn omitted.)

28

It is not reasonably likely on the whole record that the jury here was misled to defendants' prejudice. (*Boyde v. California, supra,* 494 U.S. at p. 380; *People v. Kelly, supra,* 1 Cal.4th at pp. 525-526.) Therefore, reference to hands and feet in the information and verdict forms was not error.

### 2. Instruction on Deadly Weapon Theory without Evidence

Defendants also assert that it was prejudicial error to include the deadly weapon theory of aggravated assault in the jury instructions because there was no evidence to support that theory. However, even if the evidence was insufficient to support instructions on the deadly weapon theory of aggravated assault, it is not reasonably probable defendants would have obtained a more favorable result.

Failure to remove from a jury's consideration a theory not supported by the evidence is a state law error subject to the *Watson* test – whether it is reasonably probable that the defendant would have obtained a more favorable result absent the error. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, "[t]he jury was as well equipped as any court to analyze the evidence and to reach a rational conclusion. The jurors' 'own intelligence and expertise will save them from' the error of giving them 'the option of relying upon a factually inadequate theory.' [Citation.]" (*People v. Guiton, supra,* 4 Cal.4th at p. 1131.)

IV

*Sufficiency of Evidence of Aggravated Assault*

All Defendants

Defendants argue that the convictions for assault by means of force likely to produce great bodily injury on Zepeda, Limon, and Stephanie Sampson must be reversed because there was insufficient evidence of force likely to produce great bodily injury. We conclude that the evidence was sufficient.

29

A.     *Legal Background*

"[W]hether the force used by the defendant was likely to produce great bodily injury is a question for the trier of fact to decide." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1221.)  Because the statute focuses on "force likely to produce great bodily injury" (§ 245, former subd. (a)(1)), the statute can be violated even if the victim suffers no harm at all.  (*Aguilar, supra,* 16 Cal.4th at p. 1028; *People v. Wingo* (1975) 14 Cal.3d 169, 176.)  "While it is true that 'when the evidence shows that a blow has been struck or a physical injury actually inflicted, the nature and extent of the injury is a relevant and often controlling factor in determining whether the force used was of a felonious character' [citations], an injury is not an element of the crime, and the extent of any injury is not determinative.  'The crime . . . like other assaults, may be committed without infliction of any physical injury, and even though no blow is actually struck.  [Citation.] The issue, therefore, is not whether serious injury was caused, but whether the force used was such as would be likely to cause it.'  [Citations.]" (*People v. Covino* (1980) 100 Cal.App.3d 660, 667.)  "The statute prohibits an assault by any means of force likely to produce great bodily injury, not the use of force which does in fact produce such injury. While . . . the results of an assault are often highly probative of the amount of force used, they cannot be conclusive." (*People v. Muir* (1966) 244 Cal.App.2d 598, 604, italics omitted; *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1065-1066.)  "[T]he question of whether or not the force used was such as to have been likely to produce great bodily injury, is one of fact for the determination of the jury based on all the evidence, including but not limited to injury inflicted." (*People v. Muir, supra,* at p. 604; in accord, see also *People v. Armstrong, supra*, at p. 1066, and *People v. Sargent, supra,* at p. 1221.)  "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. Covino, supra,* p. 668; *People v. Armstrong, supra,* at p. 1066.)

B.    *Sufficiency of Evidence*

      1.      David Zepeda (count 7)

Zepeda testified that he was walking with Angelo DeHaro on the sidewalk at about 10:00 p.m. on December 18, 2009, when he heard a whistle and saw men, with bandanas over their faces, starting to chase him. He ran but slipped on wet grass. Before he could stand up fully, defendants attacked him. He fell back to the ground as they kicked him and beat him in the upper body, including his stomach and head. While they were attacking Zepeda, they told him to say, "[F]uck [N]orte." One assailant pointed a gun at his face. He curled up into a ball, covering his face and head with his arms and hands, trying to protect himself. Towards the end of the attack, an assailant told the others, "Let's go. Let's get out of here." The attack lasted a few seconds. Zepeda sustained lumps on his head, as well as bruises and scratches on his body. He went to the hospital that night but did not receive medical care for his injuries.

The evidence of the assault on Zepeda was sufficient to establish that it was committed by means of force likely to produce great bodily injury. Zepeda was punched and kicked repeatedly in the head and upper body while he was on the ground. He did not suffer great bodily injury because he curled up in a ball and protected his face and head with his arms and hands. Even doing so, he sustained lumps on his head, as well as bruises and scratches on his body. The jury could have inferred that, if Zepeda had not protected himself, he would have been severely injured.

      2.      Robert Limon (count 11)

Limon testified that he, Stephanie Sampson, and Spencer Sampson left Bonfare Market on foot together on the evening of December 18, 2009. Soon after they left the market, some men passed them in a red car. The car came to a stop and the men got out of the car, running toward Limon and the Sampsons aggressively. Two of the assailants attacked Limon, who tried to fight them off. They landed blows on Limon, even though

he was trying to protect himself. Eventually, the attack got "out of control," and Limon was knocked to the ground. He heard a shot fired, so he stayed on the ground to avoid being shot. Stephanie Sampson testified that she saw that Limon was on the ground and two of the assailants were "jumping" him. When asked on cross-examination whether the assailants had "pummel[ed]" him, Limon said, "No."

This evidence of the assault on Limon was also sufficient to establish that it was committed by means of force likely to produce great bodily injury. Defendants approached Limon aggressively and attacked him, apparently with their fists. The attack got "out of control" and was violent enough to knock Limon to the ground, even though he was trying to protect himself. While Limon testified that defendants did not "pummel" him, the jury could have concluded that was mere boasting despite the evidence that defendants landed blows on Limon and knocked him to the ground.

3. Stephanie Sampson (count 10; defendant Flores only)

Stephanie Sampson testified that, during the attack after they had left Bonfare Market, one of the assailants struck her in the ear. At the time of trial, she still was experiencing hearing loss from the attack. Two of the assailants continued attacking Stephanie Sampson, even after her brother was on the ground after being shot.

That Stephanie Sampson sustained a blow to the head sufficient to produce lasting hearing loss is ample evidence that the assault was committed by means of force likely to produce great bodily injury. Hearing loss is significant and substantial bodily injury. (*People v. Poulin* (1972) 27 Cal.App.3d 54, 63.)

Defendants' sufficiency of evidence contentions with respect to the assaults with force likely to produce great bodily injury are without merit.

V

*Sufficiency of Evidence of Gang Allegations*

All Defendants

The prosecution presented evidence at trial that defendants were members of a criminal street gang as defined by section 186.22 to support allegations that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)) and that a gang member used a firearm (§ 12022.53, subds. (d) & (e)). On appeal, defendants contend: (1) evidence that the Sureños are a criminal street gang was insufficient to support the gang enhancements because there was insufficient evidence of the relationship between Proud Brown Trece and the Sureños and (2) the prosecution failed to introduce sufficient evidence of the primary activities and pattern of criminal conduct of the gang. In our original opinion in this case, we concluded that the evidence was sufficient. Defendants petitioned for review, and the California Supreme Court granted review. After the Supreme Court decided *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), it transferred this case back to us to reconsider in light of *Prunty*. We conclude that the prosecution established that defendants were Sureño gang members, not just members of the Proud Brown Trece subset. In other words, they were acting as Sureño gang members when they committed the crimes, not just as Proud Brown Treces. These circumstances are different, and distinguishable, from the circumstances in *Prunty* because the prosecution did *not* (1) seek to prove a gang enhancement by showing defendants committed a felony to benefit a broader umbrella gang, while (2) seeking to prove the requisite pattern of criminal gang activity with evidence of felonies committed by members of subsets to the umbrella gang.

A.    *Legal Background*

Section 186.22, subdivision (b) provides an additional term of imprisonment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." For purposes of this enhancement, a " 'criminal street gang' " is "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary

33

activities the commission of one or more of the criminal acts enumerated in [the statute], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A " 'pattern of criminal gang activity' " is "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [certain] offenses [identified in the statute], provided at least one of these offenses occurred after the effective date of [the law] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons[.]" (§ 186.22, subd. (e).)

"We utilize the substantial evidence test to determine whether the prosecution has introduced sufficient evidence to meet its burden of proof beyond a reasonable doubt. [Citations.] The California Supreme Court has held, 'The substantial evidence test applies both when an appellate court is reviewing on appeal the sufficiency of the evidence to support a conviction and when a trial court is deciding the same issue in the context of a motion for acquittal under . . . section 1118.1 at the close of evidence.' (*People v. Cuevas* (1995) 12 Cal.4th 252, 261; see also *People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13 [evidence includes all reasonable inferences that may be drawn]; *People v. Trevino* (1985) 39 Cal.3d 667, 695, overruled on another ground in *People v. Johnson* (1989) 47 Cal.3d 1194, 1221.) The substantial evidence standard of review applies to section 186.22 gang enhancements. (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484; *In re Lincoln J.* (1990) 223 Cal.App.3d 322, 330-331.)" (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.)

B.      *Facts Concerning Gang Enhancement*

Detective Matthew Sierra of the Tracy Police Department testified concerning gangs, specifically in Tracy. His focus was on Hispanic criminal street gangs. His duties included investigating gang crimes, talking to gang members, reading reports concerning

gangs, talking to other officers who investigated gang crimes, and talking to other agencies concerning gangs. On the motion of the prosecutor, and with no objection from counsel for the various defendants, Detective Sierra was declared an expert witness on Hispanic criminal street gangs within Tracy.

Detective Sierra commonly investigated the Sureño gang and crimes committed by gang members. Sureños identify themselves as Sureños when they are contacted. Sometimes, they also say that they are associated with a subset such as, in Tracy, Proud Brown Trece or South Side Riders, but those gang subset members are Sureños. Detective Sierra had daily contact with members of the Sureño criminal street gang.

Sureños and Norteños are large criminal street gangs in California and are rivals. There are more than 100 Sureños and more than 400 Norteños in Tracy. Of the more than 100 Sureños in Tracy, seven were of the Proud Brown Trece subset. Sureños associate themselves with variations on the number 13, including in tattoos and correspondence.

Detective Sierra testified that Sureños engage in murder, attempted murder, assault with a deadly weapon, shooting at an inhabited dwelling, shooting from a vehicle, torture, mayhem, kidnapping, identity theft, vandalism, burglary, possession of a stolen vehicle, possession of firearms, and drug sales. They commonly carry firearms and travel in groups for protection.

Sureño gang member Marcos Vasquez was convicted in 2009 of attempted murder, discharge of a firearm from a vehicle, street terrorism, and possession of a controlled substance.

Sureño gang member Jose Garcia Losa was convicted in 2009 of attempted murder and street terrorism. Garcia Losa was also convicted of possession of a handgun in 2008.

Sureño gang member Moises Laguna was convicted in 2009 of assault with a deadly weapon likely to produce great bodily injury and street terrorism for his involvement in the crimes with Garcia Losa.

Detective Sierra assisted in the investigation and prosecution of Vasquez, Garcia Losa, and Laguna.

Detective Sierra testified concerning the identification of defendants Flores, Hernandez, and Arias as members of a criminal street gang.

Defendant Flores communicated on an ongoing basis by cell phone with other known Sureño gang members, and on his cell phone he had two songs that reference Sureño gang membership. The songs referred to "south side" and used derogatory terms about Norteños, terms typically used by Sureños. Detective Sierra gave his expert opinion based on the evidence that defendant Flores is a Sureño gang member.

Defendant Hernandez's cell phone had a GIF file (series of pictures) of defendant Hernandez and two other people. They were making signs with their hands signifying PBT (for Proud Brown Trece); there was a derogatory term in the pictures about Norteños; the men wore blue bandanas, which is indicative of Sureño gang membership; the word "Sur," signifying Sureño appeared; handguns were in the picture; and "X3" appeared, which reflects the number 13. Also on his phone were contacts identified by the monikers of several Sureño gang members, and it contained an obituary of another Sureño gang member. When defendant Hernandez was taken into custody, he had a blue bandana is his pocket, folded in the manner that Sureños fold bandanas. Detective Sierra gave his expert opinion based on the evidence that defendant Hernandez is a Sureño gang member.

Defendant Arias was known to associate with members of both South Side Riders and PBT, which are Sureño subsets, and with documented Sureño gang members. He has PBT tattooed on his hand. When contacted, he possessed a blue bandana, and he admitted that he is a Sureño. He was responsible for graffiti painted in blue, containing

36

"Sur" and the number 13. When he was taken into custody, he was in possession of a blue cloth belt with the number 13 on it. His cell phone showed contact with known gang members and identified them by their Sureño gang monikers. Detective Sierra gave his expert opinion based on the evidence that defendant Arias is a Sureño gang member of the PBT subset.

As to all three defendants, the evidence in this case established that they were hunting for Norteños to attack, which is a common activity of Sureño gang members. And they succeeded in that effort. Finally, they each associated and participated together with the other defendants in the activities for which they were prosecuted, thus providing further evidence of their Sureño gang membership.

C. *Sufficiency of Evidence*

1. Connection Between Gang Subset and Larger Gang

Defendants argue that the prosecution failed to establish an associational or organizational connection between the subset Proud Brown Trece gang and the larger Sureño gang. We conclude that, because the evidence established that defendants were part of the larger Sureño gang, not just of the Proud Brown Trece subset, it was unnecessary to additionally establish an associational or organizational connection between the Sureño gang and the Proud Brown Trece gang.

Citing *People v. Williams* (2008) 167 Cal.App.4th 983, defendants contend that, in proving that a crime was committed for the benefit of a criminal street gang, the prosecution is limited to evidence about the activities of the local gang subset unless the prosecution establishes that the local subset collaborates and shares organization with the larger gang. We disagree based on the facts of this case. There was evidence here that

37

defendants belong to the broader Sureño criminal street gang, not just the subset Proud Brown Trece.[7]

The evidence of primary activities and pattern of criminal conduct presented through Detective Sierra pertained to the Sureños generally. He testified as an expert witness that defendants were Sureños based on clothing, contacts with other gang members, colors, symbols such as the number 13, and their specific activities. He also testified as an expert that Sureños operate under the umbrella of the Mexican Mafia prison gang.

The *Williams* court noted that "[e]vidence of gang activity and culture need not necessarily be specific to a particular local street gang as opposed to the larger organization," but the court concluded that "having a similar name is [not], of itself, sufficient to permit the status or deeds of the larger group to be ascribed to the smaller group." (*People v. Williams, supra,* 167 Cal.App.4th at p. 987.) The expert in the case had "testified that the Peckerwoods are a criminal street gang, as defined by the Penal Code, and that smaller groups, such as the Small Town Peckerwoods, are all factions of the Peckerwood organization." (*Id.* at p. 988.) As far as the record showed, however, the expert's conclusion "appear[ed] to have been based on commonality of name and ideology, rather than concerted activity or organizational structure." (*Ibid.*) The court concluded as follows: "In our view, something more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang. Instead, some sort of collaborative activities or collective organizational structure

---

**7**     Because we conclude that the evidence supports the finding that defendants were Sureños and the Sureño gang is a criminal street gang, we need not also consider whether Proud Brown Trece is also a criminal street gang. We note that the Attorney General makes the argument that Proud Brown Trece is a criminal street gang, as an alternative to the argument that Sureños are a criminal street gang.

must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization.  There was no such showing here." (*Ibid*.)

Despite the fact that the prosecution in this case proved that defendants were Sureños and that Sureños meet the "primary activities" and "pattern of criminal conduct" elements of the gang enhancements, defendants claim that section 186.22 requires more. We disagree.  While defendants claimed they were Proud Brown Treces, the evidence also established that they were Sureños.  They made themselves appear as Sureños (tattoos and clothing); they communicated on an ongoing basis with other Sureño gang members; at least one of them associated with another Sureño subset; and they did what Sureños do (engaged in the violent conduct mentioned above, including against Norteños).  From this evidence, the jury could reasonably infer that there was an associational and organizational relationship between defendants and other Sureños, thus satisfying the requirements noted in *Williams*.

*Prunty* addressed what must be shown to establish the "ongoing organization" element of a criminal street gang.  (*Prunty, supra*, 62 Cal.4th at p. 71.)  In *Prunty*, the court considered "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Id.* at p. 67.)  The issue "arises only when the prosecution seeks to prove a street gang enhancement by showing the defendant committed a felony to benefit a broader umbrella gang, but seeks to prove the requisite pattern of criminal gang activity with evidence of felonies committed by members of subsets to the umbrella gang." (*Id.* at p. 91 (Corrigan, J., conc. in judg.).)  The *Prunty* court concluded that "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Id.* at p. 71.)

39

This case does not suffer from the infirmities noted in *Prunty*. In that case, the prosecution proved that the defendants were Norteños but then tried to establish that Norteños are a criminal street gang because of the activities of subsets that were not proven to be associated with Norteños. That was not enough. The court concluded that the "definition of a 'criminal street gang' – and in particular its requirement of an 'organization, association, or group' – calls for evidence that an organizational or associational connection unites the 'group' members. When, as here, the prosecution relies on the conduct of subsets to show a criminal street gang's existence, the prosecution must show a connection among those subsets, and also that the gang those subsets comprise is the same gang the defendant sought to benefit." (*Prunty, supra,* 62 Cal.4th at p. 85.)

Unlike in *Prunty*, the prosecution in this case did not rely on the conduct of subsets to show a broader criminal street gang's existence. Instead, the prosecution in this case relied on the conduct of Sureños to show that Sureños are a criminal street gang. Therefore, the argument that *Prunty* requires reversal is without merit.

The evidence in this case established that defendants were Sureños. Therefore, evidence of the Sureños' primary activities and pattern of criminal conduct was appropriate and sufficient to establish that defendants committed their crimes for the benefit of a criminal street gang.[8]

      2.     Primary Activities

---

[8] In his supplemental brief after transfer from the Supreme Court, defendant Arias added a contention that the instructions given to the jury concerning the gang elements involved in this case were deficient because they did not include the requirement, as stated in *Prunty*, of an organizational or associational connection between the Sureño gang and the subset Proud Brown Trece gang. This contention is without merit because, as noted above, the evidence established that defendants were Sureños, thus obviating the need to establish that they were also Proud Brown Treces with an associational or organizational connection to the Sureño gang.

Defendants contend that Detective Sierra's testimony failed to establish the "primary activities" element of the gang enhancement because (1) it was vague and conclusory and (2) it was unsupported by a credible and reliable foundation. We disagree.

Detective Sierra testified that Sureño gang members in Tracy engaged in crimes listed in section 186.22, subdivision (e) as their primary activities. He said that Sureños engage in "[m]urder, attempted murder, assault with a deadly weapon, shooting into an inhabited dwelling, shooting from a vehicle, drive-by shooting, torture, mayhem, kidnapping, identity theft, felony vandalism, burglary, possession of stolen vehicle[s], [and] being in possession of a handgun."

A " 'criminal street gang' " is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage or have engaged in a pattern of criminal gang activity."[9] (§ 186.22, subd. (f).) This component of the gang enhancement "requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a

---

**9**    Among those enumerated acts are murder, attempted murder, assault with a deadly weapon, shooting at an inhabited dwelling, discharging a firearm from a vehicle, torture, mayhem, kidnapping, unlawful use of personal identifying information, felony vandalism, burglary, unlawful taking or driving of a vehicle, and prohibited possession of a firearm. (§ 186.22, subd. (e).)

41

pattern of criminal gang activity.' " (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222, quoting *People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)

In *People v. Sengpadychith* (2001) 26 Cal.4th 316 (*Sengpadychith*), our Supreme Court held that " 'either prior conduct or acts committed at the time of the charged offenses can be used to establish the "primary activities" element of the gang enhancement.' " (*Id.* at p. 323, quoting *People v. Galvan* (1998) 68 Cal.App.4th 1135, 1140.) The Supreme Court explained: "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities. Both past and present offenses have some tendency in reason to show the group's primary activity (see Evid. Code, § 210) and therefore fall within the general rule of admissibility (*id.*, § 351)." (*Sengpadychith, supra,* at p. 323.) However, the Supreme Court was also careful to point out that evidence of either past or present criminal acts alone would "[n]ot necessarily" be sufficient to prove the group's primary activities, explaining: "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . 'Though members of the Los Angeles Police Department may commit an enumerated offense while on duty, the commission of crime is not a primary activity of the department. Section 186.22 . . . requires that one of the primary activities of the group or association itself be the commission of [specified] crime[s]. . . .' " (*Id.* at pp. 323-324, italics omitted.)

The Supreme Court then explained: "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in [*Gardeley, supra,* 14 Cal.4th 605]. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a

member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. [Citation.]" (*Sengpadychith, supra,* 26 Cal.4th at p. 324, quoting *Gardeley, supra*, 14 Cal.4th at p. 620, italics omitted.)

Similarly, in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*), the Court of Appeal held the following expert testimony was sufficient to support the "primary activities" element of the gang statute: "Schulze, who had spent the majority of his 14 years in law enforcement dealing with gangs, testified that for the past eight years he had worked in East Los Angeles, the King Kobras territory. He was familiar with the gang based on regular investigations of its activity and interaction with its members. He was also familiar with tattoos KK and VKKR, both of which identify the bearer as a member of King Kobras. He testified that at the time the crime was committed, it had documented members numbering 115 to 120. The gang's primary activities include robbery, assault – including assaults with weapons, theft, and vandalism. He testified about two predicate offenses, both robberies, one in 2002 and one in 2003." (*Id.* at p. 1330.)

Distinguishing *In re Alexander L.* (2007) 149 Cal.App.4th 605, a case in which the gang expert "merely stated 'he "kn[e]w" that the gang had been involved in certain crimes [and] did not directly testify that criminal activities constituted [the gang's] primary activities,' " the *Martinez* court stated: "Here, on the other hand, Schulze had both training and experience as a gang expert. He specifically testified as to King Kobras's primary activity. His eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony." (*Martinez, supra,* 158 Cal.App.4th at p. 1330, citing

43

*Gardeley, supra,* 14 Cal.4th at pp. 619-620.) Finally, the court noted that the defendant's current offense, committed with another gang member, "is also evidence of the gang's primary activity and is consistent with Schulze's testimony." (*Martinez, supra,* at p. 1330, citing *Sengpadychith, supra,* 26 Cal.4th at p. 323.)

Here, similar to *Martinez, supra*, 158 Cal.App.4th 1324, Detective Sierra had both training and experience as a gang expert. He investigated crimes committed by Sureños, generally, as wells as members of the Proud Brown Trece subset. He had contact with Sureños gang members on a daily basis, and he stayed abreast of Sureño developments by reading police reports of their activities both in Tracy and elsewhere. Finally, he specifically testified as to the Sureños' primary activities. (*Martinez, supra,* 158 Cal.App.4th at p. 1330; see also *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107-108.) This evidence was sufficient to establish the Sureños' primary activities.

### 3. Pattern of Criminal Conduct

Defendants also contend that there was no credible or reliable factual foundation for Detective Sierra's opinion as to the Sureños primary activities. They argue that "[h]e did not even attempt to explain the basis for his opinion, although he did state during another portion of his testimony that he had had numerous contacts with Sureños." This contention is also without merit. Detective Sierra testified concerning his daily contacts with Sureños and his reading of police reports from Tracy and elsewhere of Sureños' criminal activities. This provided a factual foundation for his opinion concerning the Sureños' pattern of criminal conduct. In addition to Detective Sierra's testimony, the evidence of the crimes in this case also established a pattern of criminal conduct.

## VI

### *Sufficiency of Evidence of Gang-related Firearm Enhancement*

### All Defendants

If a defendant, in committing one of several enumerated offenses, including murder (§ 12022.53, subd. (a)(1)), personally and intentionally discharged a firearm,

44

proximately causing great bodily injury or death, the defendant is subject to an additional indeterminate of 25 years to life.  (§ 12022.53, subd. (d).)[10]  If a defendant is a principal in one of the enumerated crimes *and* did so for the benefit of a criminal street gang, the defendant is subject to the 25-year-to-life enhancement if any other principal in the crime discharged a firearm, proximately cause great bodily injury or death.  (§ 12022.53, subd. (e).)[11]

Here, the trial court imposed a 25-year-to-life enhancement under section 12022.53, subdivisions (d) and (e) on defendants Arias and Hernandez for the murder of Spencer Sampson because (1) each defendant was a principal, (2) one of them discharged a firearm, proximately causing death, and (3) the crime was committed by each defendant for the benefit of a criminal street gang.[12]

On appeal, defendants Arias and Hernandez contend that we must reverse the 25-year-to-life enhancements because the evidence was insufficient to establish that the murder was committed for the benefit of a criminal street gang.  For this contention, they rely on the reasoning we rejected in part V, above, that the prosecution failed to establish

---

**10**    Section 12022.53, subdivision (d) provides:  "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of [former] Section 12034 [current Section 26100], personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

**11**    Section 12022.53, subdivision (e) provides:  " (1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:  [¶]  (A) The person violated subdivision (b) of Section 186.22.  [¶]  (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

**12**    Defendant Flores also joins in this contention; however, the jury found not true the allegations under section 12022.53, subdivisions (d) and (e).  Hence, the contention does not apply to him.

that Proud Brown Trece was a criminal street gang.  Because there was sufficient evidence that defendants committed all the crimes for the benefit of a criminal street gang (the Sureños), the contention that we must reverse the 25-year-to-life enhancements for discharge of a firearm by a principal, proximately causing death, is without merit.

Defendants Arias and Hernandez also contend that, assuming the evidence was *not* sufficient to establish that the murder of Spencer Sampson was committed for the benefit of a criminal street gang, the trial court erred by not instructing the jury on section 12022.53, subdivision (d), alone – that is, the court did not instruct the jury that only the person who personally discharged the firearm is subject to the enhancement.  The contention is without merit because the evidence was sufficient that defendants committed the murder of Spencer Sampson for the benefit of a criminal street gang and, therefore, defendant Arias and Hernandez, as principals, were subject to the enhancement.  (§ 12022.53, subd. (e).)

VII

*Sufficiency of Evidence of Aiding and Abetting Attempted Murder*

Flores

Defendant Flores contends there was insufficient evidence to establish that he aided and abetted Jose Hernandez's premeditated attempted murder of James Stancampiano because there was insufficient evidence that (1) anyone shot at Stancampiano with intent to kill or (2) defendant Flores shared the direct perpetrator's intent to kill.  The Attorney General responds that there was sufficient evidence that defendant Flores aided and abetted Jose Hernandez who intended to kill and that defendant Flores shared the intent to kill.  We conclude the evidence was sufficient.

Premeditated attempted murder requires (1) specific intent to kill and (2) commission of a direct but ineffectual act toward accomplishing the killing.  Under the aiding and abetting theory presented to the jury in this case, the aider and abettor must give the direct perpetrator aid and encouragement (1) knowing the direct perpetrator's

specific intent to kill and (2) intending to facilitate the accomplishment of the killing. (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.)

Stancampiano was the victim in the third of three incidents on December 16. In his statement to Detective Ramirez, defendant Flores admitted that he and the other defendants were looking for Norteños because some Norteños had beaten up someone. They wanted to "get" the Norteños.

Defendant Flores and his fellow gang members first saw a "John Doe" Norteño and chased him. One of defendant Flores's fellow gang members shot at John Doe three to five times.

Defendant Flores was then involved in the assaults on Edward Rigor and Melanie Bartolomei. While defendant Flores claimed that he stayed in his truck, the evidence was to the contrary. He and defendant Arias confronted Rigor and Bartolomei and demanded that Rigor say, "[F]uck [N]orte." When he refused, either defendant Flores or defendant Arias shot at Rigor as Rigor and Bartolomei were walking away. Rigor was seriously wounded.

It was after these incidents on the evening of December 16 that defendant Flores and his fellow gang members saw Stancampiano, another Norteño. They chased him, and shots were fired. Defendant Flores was the one who tried to flush Stancampiano out of Supercuts after Stancampiano had found refuge there.

In a text message on December 18, defendant Flores bragged that he and his fellow gang members had shot three Norteños and had hit the target.

Even assuming defendant Flores was not the actual shooter in the Stancampiano incident, the evidence was sufficient to allow the jury to draw reasonable inferences that the shooter intended to kill Stancampiano and took a direct but ineffectual act toward accomplishing the killing by shooting at Stancampiano. In light of the earlier shootings, the most recent of which produced a near killing of Rigor, the evidence was also

47

sufficient to allow the jury to draw reasonable inferences that defendant Flores knew of the actual shooter's intent to kill and that he intended to facilitate the killing.

Applying the substantial evidence test (*People v. Augborne, supra,* 104 Cal.App.4th at p. 371), we conclude that there was sufficient evidence that defendant Flores aided and abetted the premeditated attempted murder of Stancampiano.

## VIII

### *Sufficiency of Evidence of First Degree Murder*

### Flores and Arias

Defendants Arias and Flores were each convicted of first degree murder of Spencer Sampson. (Defendant Hernandez was convicted of second degree murder of Spencer Sampson.) On appeal, defendants Arias and Flores contend that the evidence was insufficient to sustain their first degree murder convictions because there was no substantial evidence of premeditation and deliberation, the only theory on which the first degree murder charge was tried. The contention is without merit.[13]

A person commits first degree murder when the killing is "willful, deliberate, and premeditated." "To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." (§ 189.) " ' "Deliberation" refers to [a] careful weighing of

---

[13] The Attorney General notes that defendant Flores did not originally make this contention but joined in defendant Arias's assertion that the evidence was insufficient to support a first degree murder conviction. She also observes that it is inappropriate for defendant Flores simply to join defendant Arias's argument because their roles in the murder were necessarily different in some respects, citing *People v. Nero* (2010) 181 Cal.App.4th 504, 510, footnote 11. In his reply brief, defendant Flores makes no attempt to rectify this shortcoming in his joinder. We agree with the Attorney General, and for that reason we find wanting defendant Flores's contention that the evidence was insufficient to support his conviction for first degree murder of Spencer Sampson. We also conclude that defendant Flores's contention is without merit on the arguments made by defendant Arias.

48

considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' [Citations.]" ' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1182.)

Evidence of premeditation is often presented circumstantially. Appellate courts have observed three categories, or features, of evidence are often present in cases where premeditation has been found: planning, motive, and manner of killing. A combination of these categories or features is sufficient to support a finding of premeditation. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27; see also *People v. Halvorsen* (2007) 42 Cal.4th 379, 419-420 ["Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight."].)

There was evidence that defendants planned the killing of Spencer Sampson. Defendants were involved in several assaults, including attempted murder, just two days before.[14] Again, on December 18, they were out assaulting those they perceived as

---

[14]    While we recognize that defendant Arias was not convicted of the attempted murders committed on December 16, the evidence of his involvement is relevant to his conviction for the murder of Spencer Sampson. "It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] The United States Supreme Court has explained: '[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 656, quoting *United States v. Powell* (1984) 469 U.S. 57, 67 [83 L.Ed.2d 461, 470].)

49

rivals, and again they had a gun. They were looking specifically for Spencer Sampson. When they found him, they killed him.

There was ample evidence of motive. Defendants were intent on killing rivals.

And there was evidence that the manner of killing indicated premeditation and deliberation. Defendants brought a gun to what they want us now to conclude was only a fistfight. Spencer Sampson was shot in the chest. Considering defendants' activities on December 16 and 18 and the specifics of the assault on Spencer Sampson, the jury had sufficient evidence to conclude that defendants Flores and Arias murdered Sampson willfully, after premeditation and deliberation.

Defendants Flores and Arias focus on five circumstances that they assert preclude (or at least weigh against) a finding of premeditation and deliberation: (1) gang members often have guns for protection, (2) two of the other assaults on Norteños involved a gun that was not fired, (3) the assault on the Sampsons and Limon did not begin with a shooting, (4) the assault on the Sampsons and Limon began with a fistfight, and (5) only one shot was fired.

These were circumstances defendant could argue and the jury could consider in determining whether there was premeditation and deliberation, but they certainly do not preclude a finding of premeditation and deliberation in the murder of Spencer Sampson. As noted above, there was substantial evidence of premeditation and deliberation; therefore, the contention of defendants Flores and Arias to the contrary is without merit.

IX

*Special Circumstance Instruction*

Flores

Defendant Flores's jury convicted him of first degree murder of Spencer Sampson. It found true the special-circumstance allegation that the murder was committed for the benefit of a criminal street gang (§ 190.2, subd. (a)(22)), but it found not true the enhancement allegation that a principal intentionally and personally discharged a firearm

50

(§ 12022.53, subds. (d) & (e)). On appeal, defendant Flores contends that we must reverse the special-circumstance finding that the murder was committed for the benefit of a criminal street gang because it is reasonably likely that jury did not understand from the court's instructions that he must have intended to kill Sampson. The contention is without merit because the instructions allowed a true finding only if defendant Flores "intentionally killed Spencer Sampson."

Section 190.2, subdivision (a)(22) defines as a special circumstance, "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Thus, intent to kill the victim is an element of the gang-killing special circumstance.

The trial court instructed the jury using the language of the statute as it pertains to the "intent to kill" element, instructing that it must find "[t]he defendant intentionally killed Spencer Sampson."[15]

The only element of the special circumstance challenged by defendant Flores on appeal is intent to kill.

As to the murder count, the prosecutor argued to the jury that defendant Flores was guilty of first degree murder because he aided and abetted or engaged in a conspiracy to kill Sampson, and in doing so he intended to kill Sampson. The prosecutor also argued to the Flores jury that defendant Flores was guilty of murdering Sampson on a natural

---

[15]    The trial court used CALCRIM No. 736 to instruct the jury concerning the gang-killing special circumstance. As given, the relevant part of the instruction stated: "To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed Spencer Sampson; [¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The defendant knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity; [¶] AND [¶] 4. The murder was carried out to further the activities of the criminal street gang."

51

and probable consequences theory if, in the prosecutor's words, "a reasonable person in the defendant's position would have known that the commission of the murder was the natural and probable consequences of the commission of that assault [on Sampson]."

Some of the evidence in this case indicated that defendant Arias was the direct perpetrator of the Spencer Sampson killing. And section 190.2, subdivision (c) applies the special circumstances to "[e]very person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder . . . ."

Concerning the gang-killing special circumstance, the prosecution argued "that [defendant Flores] intentionally killed Spencer Sampson, whether he pulled the trigger or one of the co-participants or another principal did, so as an aider and abettor." Notably, the prosecutor did not tell the jury that it could use the natural and probable consequences theory to find the gang-killing special circumstance true.

On appeal, defendant Flores contends that the language of the instruction did not sufficiently apprise the jury of the "intent to kill" element of the gang-killing special circumstance. He argues: "The problem with the language in CALCRIM No. 736 – 'the defendant intentionally killed' – is that it fails to explain to jurors how the special circumstance can apply to an aider and abettor who did not actually kill anyone. The lack of clarity is compounded by . . . the instruction on natural and probable consequences, which imputes an intentional murder to an aider and abettor without requiring proof that the aider and abettor intended to kill." We disagree.

We presume that jurors are intelligent and capable of understanding, correlating, and applying the court's instructions. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) Moreover, in reviewing a claim of jury misinstruction, we must also consider the instructions as a whole, not as isolated parts. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) The issue is whether it is reasonably likely the instructions, viewed in

context with other instructions, were applied by the jury in an impermissible manner. (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

The trial court informed the jury that it could find the gang-killing special circumstance true only if defendant Flores "intentionally killed Spencer Sampson." Neither any instruction nor the argument of the prosecutor told the jury that it could use the natural and probable consequences theory to impute in defendant Flores an intent to kill Sampson. To the contrary, the prosecutor argued, based on the instruction given, that defendant Flores is liable for the special circumstance because he either pulled the trigger with intent to kill or aided and abetted with intent to kill another who pulled the trigger. The jury was instructed that aiding and abetting a first degree murder required an intent to kill. Accordingly, viewing the instructions as a whole in the context of this case, it is not reasonably likely the jury believed it could base a true finding of the gang-killing special circumstance on a natural and probable consequences theory without finding an intent to kill.

Defendant, however, argues that the trial court should have clarified the "intent to kill" element of the gang-killing special circumstance by using CALCRIM No. 702. That instruction states that if the jury finds the defendant was not the actual killer it must consider, with respect to certain special circumstances, not including the gang-killing special circumstance, whether the defendant acted with intent to kill.[16] (CALCRIM No. 702.) Defendant Flores could have requested an instruction based on a modified

---

**16** CALCRIM No. 702 states, in pertinent part: "If you decide that (the/a) defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance[s] of <insert only special circumstance[s] under Pen. Code, §§ 190.2(a)(2), (3), (4), (5) or (6)>, you must also decide whether the defendant acted with the intent to kill. [¶] In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove that the defendant acted with the intent to kill . . . ."

CALCRIM No. 702, but he did not. (See *People v. Lang* (1989) 49 Cal.3d 991, 1024 [party may not complain on appeal that correct instruction was too general or incomplete unless party requested clarifying or amplifying language].)

We conclude that, in the context of this case and the instructions given, the instructions sufficiently apprised the jury that the gang-killing special circumstance required a finding that defendant Flores intentionally killed Sampson, whether as the direct perpetrator or as an aider and abettor. His contention to the contrary is without merit.

X

*Sufficiency of Evidence of Gang-killing Special Circumstance*

Flores and Arias

Defendants Flores and Arias contend that the juries' true findings on the gang-killing special circumstance allegations were not supported by sufficient evidence. Defendant Flores argues that there was insufficient evidence that (1) he intended to kill Sampson and (2) defendants' gang engaged in the requisite primary activities and pattern of criminal conduct. Defendant Arias joins in the latter argument. Neither argument has merit.

A.     *Intent to Kill*

As noted above, the gang-killing special circumstance includes an "intent to kill" element. Defendant Flores asserts there is insufficient evidence to establish that he intended to kill Spencer Sampson. In making this argument, however, defendant Flores cites only the circumstances of the crime that support a finding that he did not intend to kill Sampson. This strategy forfeits the issue on appeal. In any event, the evidence was sufficient to sustain the jury's finding that defendant Flores intended to kill Sampson.

When the appellate standard is substantial evidence review the appellant bears the burden of showing that no substantial evidence supports the challenged factual findings. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *People v. Dougherty* (1982)

54

138 Cal.App.3d 278, 282.) Failure to set forth the evidence most favorable to the factual findings results in forfeiture of the contention that substantial evidence does not support the factual findings. (*Foreman & Clark Corp. v. Fallon, supra*, at p. 881.)

Here, defendant Flores makes no attempt to recognize that there is evidence supporting a finding that he harbored an intent to kill Sampson. Instead, he cites four circumstances which he argues should result in a finding that he did not intend to kill Sampson. They are: (1) he was not the shooter; (2) he claimed he was surprised when defendant Arias fired the gun; (3) it was "stupid" to get involved in a fistfight if he intended to kill Sampson; and (4) no one had yet been killed in the gang's multiday crime spree. This reliance solely on the evidence favorable to him forfeits reviews of the substantial evidence issue.

In any event, the evidence, viewed in the light most favorable to the factual finding, supports the jury's finding that defendant Flores intended to kill Sampson. As we noted above with respect to premeditation and deliberation associated with the murder of Spencer Sampson, defendants tracked Spencer Sampson down, angry for the perceived slight at Bonfare Market. When they found him, they did not just engage in a fistfight. They shot him in the chest with the gun they brought along for that purpose. Considering defendants' activities on December 16 and 18 and the specifics of the assault on Spencer Sampson, the jury had sufficient evidence to conclude that defendants Flores and Arias intended to kill Spencer Sampson.

B.      *Gang Elements*

Defendants Flores and Arias contend the prosecution failed to establish the elements of the gang-killing special circumstance because there was insufficient evidence of the primary activities and pattern of criminal conduct. We considered and rejected this contention in connection with the gang enhancements in part V of the Discussion, above. Since the issues are the same, we conclude the evidence was sufficient.

## XI

### *Concurrent or Consecutive Indeterminate Sentencing*

### Flores and Arias

When the trial court sentenced defendants Flores and Arias, it did not indicate in its oral pronouncement whether the indeterminate terms would be consecutive to the total determinate term or to each other. The minute orders and abstracts of judgment for defendants Flores and Arias, however, reflect that those term are all consecutive. On appeal, defendants Flores and Arias contend that, because the trial court did not itself indicate whether the indeterminate terms would be consecutive, they are, by operation of law, concurrent. We agree.

Section 669, subdivision (a) provides, in part: "When a person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively. Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction. . . ." Subdivision (b) of section 669 provides, in part: "Upon the failure of the court to determine how the terms of imprisonment on the second or subsequent judgment shall run, the term of imprisonment on the second or subsequent judgment shall run concurrently." (See also *People v. Rogers* (1967) 252 Cal.App.2d 1015, 1020.)

Because the trial court did not state whether the indeterminate terms were to be served concurrently or consecutively, those terms are to run concurrently by operation of law. (§ 669, subd. (b); *People v. Rogers, supra,* 252 Cal.App.2d at p. 1020.) The indication in the minute orders and abstracts of judgment that the terms were to be

56

consecutive does not change the terms to consecutive terms. A discrepancy between the oral pronouncement and the minutes is resolved in favor of the oral pronouncement. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.)

The Attorney General argues that the terms are consecutive because (1) the court corrected the oversight when it signed the minute orders and issued the abstracts of judgment and (2) defendants Flores and Arias forfeited the contention by failing to object to the trial court's failure to determine whether the indeterminate terms would run consecutively or concurrently. Neither argument has merit.

Section 669, subdivision (b) provides, in part: "In the event that the court at the time of pronouncing the second or other judgment upon that person had no knowledge of a prior existing judgment or judgments, or having knowledge, fails to determine how the terms of imprisonment shall run in relation to each other, then, upon that failure to determine, or upon that prior judgment or judgments being brought to the attention of the court at any time prior to the expiration of 60 days from and after the actual commencement of imprisonment upon the second or other subsequent judgments, the court shall, in the absence of the defendant and within 60 days of the notice, determine how the term of imprisonment upon the second or other subsequent judgment shall run with reference to the prior incompleted term or terms of imprisonment. . . ."

The Attorney General claims that, by signing the minute orders, which provided for consecutive terms, the trial court recognized its oversight in not determining whether the terms were to run consecutively or concurrently, under section 669, subdivision (b). To the contrary, the quoted language in section 669, subdivision (b) allows for a deferred determination between consecutive or concurrent sentencing in the absence of the defendant only if there is a "prior existing judgment," not when the terms result from counts in the same case. Therefore, it did not allow a deferred determination in this case. (*In re Calhoun* (1976) 17 Cal.3d 75, 80-81.)

Also, defendants Arias and Flores did not forfeit consideration of this issue by failing to object because their indeterminate terms became concurrent by operation of law when the trial court did not designate whether they were concurrent or consecutive. There was nothing to object to.

We therefore direct the trial court to correct the clerical error in the minute orders and abstracts of judgment by correcting the minute orders and abstracts of judgment to reflect that the indeterminate terms are concurrent with, rather than consecutive to, the determinate terms. Since defendant Flores was sentenced to more than one indeterminate term, we must also direct the court to correct the clerical error to reflect that the indeterminate terms are concurrent with each other.

## XII

### *Jury Instructions on First Degree Murder*

#### Flores

In a supplemental brief filed with the permission of the court, defendant Flores contends that, applying the California Supreme Court's recent decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), we must conclude the trial court erred by instructing the jury that it could find that defendant Flores committed first degree premeditated murder based on a natural and probable consequences theory. We conclude that, unlike the trial court in *Chiu*, the court in this case properly instructed the jury that defendant Flores could not be found guilty of first degree premeditated murder unless it found that defendant Flores, himself, had the requisite intent – that is, willfulness, premeditation, and deliberation – with respect to the murder of Spencer Sampson.

In *Chiu*, the court held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]" (*Chiu, supra,* 59 Cal.4th at pp. 158-159, original italics.)

58

The *Chiu* court explained: "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors – to deter them from aiding or encouraging the commission of offenses – is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.] It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. [Citation.] [¶] However, this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder. First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.]" (*Chiu, supra,* 59 Cal.4th at pp. 165-166.)

Although a defendant may be found guilty of second degree murder based on the natural and probable consequences theory, that theory does not apply to first degree premeditated murder because the mental state required (willfulness, premeditation, and deliberation) "is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.]" (*Chiu, supra,* 59 Cal.4th at p. 166.) Therefore, "where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations

59

of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Ibid.*)

Having found error in the court's instructions because those instructions allowed the jury to find the defendant guilty of first degree premeditated murder based on the direct perpetrator's premeditation and deliberation, the *Chiu* court continued: "[W]e must determine whether giving the instructions here allowing the jury to so convict defendant was harmless error. When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder. [Citation.]" (*Chiu, supra,* 59 Cal.4th at p. 167.)

The *Chiu* court concluded that there was no basis in the record to find that the verdict was based on a valid ground. The court implicitly found that the court's instructions allowed the jury to find the defendant guilty of first degree premeditated murder based on a natural and probable consequences theory. And the court expressly found that, based on jury questions and proceedings, the jury may have focused on whether the defendant aided and abetted the first degree murder under the natural and probable consequences theory. (*Chiu, supra,* 59 Cal.4th at p. 168.) The court therefore reversed the first degree murder conviction.

In our case, the *Chiu* problem does not exist because the trial court did not instruct the jury that defendant Flores could be guilty of first degree murder under the natural and probable consequences theory if the person who shot Spencer Sampson, the "perpetrator," had the requisite intent including willfulness, premeditation, and deliberation. Instead, the court in this case instructed the jury that it could find defendant

60

Flores guilty of first degree murder only if defendant Flores, himself, had the requisite intent for first degree premeditated murder. With that instruction, the jury, by finding defendant guilty of first degree murder, necessarily found that he had the requisite willfulness, premeditation, and deliberation and, therefore, was liable for first degree murder as a direct aider and abettor, not under the natural and probable consequences theory.

The trial court instructed the jury on direct aider and abettor liability. In that instruction, based on CALCRIM No. 401, the court instructed the jury that "[t]o prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (Original italics.)

The court also instructed the jury concerning the use of the natural and probable consequences theory, using CALCRIM No. 402, as it relates to murder. The court told the jury, in part: "To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of assault with a deadly weapon or by force likely to cause great bodily injury . . . . [¶] 2. During the commission of [the assault] a coparticipant in that [assault] committed the crime of murder. [¶] AND: [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the [assault]. [¶] A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator."

61

As the *Chiu* court noted, this instruction was proper in that it allowed the jury to find defendant Flores guilty of *murder* based on the natural and probable consequences theory. The holding in *Chiu* was limited to prohibiting a conviction for *first degree premeditated* murder based on the natural and probable consequences theory. (*Chiu, supra,* 59 Cal.4th at pp. 165-166.)

Finally, the court in this case instructed the jury concerning the elements of first degree premeditated murder, using CALCRIM No. 521. Before we quote the instruction from the trial in this case, we note that the difficulty in *Chiu* arose because the trial court instructed the jury, with respect to first degree murder, that the "perpetrator" must have had the requisite intent, not the "defendant." (*Chiu, supra,* 59 Cal.4th at pp. 160-161.) Here, the court instructed the jury to determine what intent the "defendant" had.

The court instructed: "The defendant is guilty of first degree murder if the People have proved that *he* acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he[] decided to kill before completing the acts that caused death." (Italics added, unnecessary punctuation omitted.)

Nothing in the trial court's instructions allowed the jury to set the degree of murder at first degree based on anyone's intent other than defendant's own. Unlike the instructions in *Chiu*, the instructions in this case did not allow the jury to conclude that *first degree premeditated* murder was the natural and probable consequences of the assault.

Furthermore, the jury's finding that defendant committed first degree premeditated murder necessarily meant that it did not rely on the natural and probable consequences theory. Defendant, himself, intended to kill and acted with willfulness, premeditation, and deliberation. Therefore, if the jury relied on an aiding and abetting theory, it had to

62

be direct aiding and abetting liability, not aiding and abetting based on the natural and probable consequences theory.

Because there was no instructional error and the jury's verdict established that it did not rely on the natural and probable consequences theory for a first degree premeditated murder conviction, defendant is not entitled to reversal under *Chiu*.

## DISPOSITION

The judgments are affirmed. The trial court is directed to correct the minute orders and abstracts of judgment with respect to defendants Arias and Flores to indicate that the indeterminate terms are to be served concurrently with the determinate terms and, in defendant Flores's case, the other indeterminate terms. The court is also directed to send the corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

      NICHOLSON    , J.

We concur:

      BLEASE      , Acting P. J.

      HULL      , J.